UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

In re:

CHAD EUGENE KNOX,

         Debtor.
_____/

Case No. 10-50195-wsd
Chapter 7
Hon. Walter Shapero

PATRICIA DAY,

         Plaintiff,

v.

Adversary No.10-06356-wsd

CHAD EUGENE KNOX,

         Defendant.
_____/

## OPINION DETERMINING DEBT TO BE NON-DISCHARGEABLE

Plaintiff seeks a finding of non-dischargeability under 11 § U.S.C. 523(a)(2)(A) (and as part thereof claimed violations of the Michigan Consumer Protection Act and Home Solicitation and Sales Act, and conversion) for a claimed liability or debt of Defendant ("Debtor") arising from activities and transactions surrounding the foreclosure of a mortgage on her home. What first follows are the Court's findings of fact derived from a combination of an extensive stipulation of facts in the final pretrial order and the trial witnesses and exhibits.

## I. FACTS

Plaintiff initially purchased her home at 11812 College Street ("Property") in Detroit in 1975. She later refinanced a prior mortgage, but thereafter her financial situation deteriorated to the point where she defaulted on that refinanced mortgage. That led to foreclosure by advertisement,

1

a sheriff's sale on June 2, 2005, and a sheriff's deed setting forth a redemption price of some $54,719.42 with a redemption period ending six months from June 2, 2005.

Defendant, himself and/or doing business under various assumed names, was in the business of investing in and purchasing foreclosed upon homes, and/or otherwise dealing with persons like Plaintiff who were in jeopardy of losing their interests in such. In the course of his business he would become aware of pending foreclosures through published foreclosure notices and other public sources of information, using such to contact the owners involved. He would do so with a view to possibly assisting them in deferring the loss of, or regaining, the property or some of its value, if any, and in the process seeking to earn a profit or compensation for himself. In this case, Defendant sent a communication to Plaintiff, the purport of which was that, among other things, there was a way for her to obtain cash for any equity she may have in the property. She responded by contacting Defendant. Thereafter, starting sometime in August 2005, a series of events took place, the timing of which was governed by the looming December 2, 2005, expiration of the Plaintiff's equity of redemption. Defendant's general "scheme" (and that is a fair description for what developed) was that he (and/or someone associated with him) would agree to purchase the interest of the owner being foreclosed upon, i.e., Plaintiff in this instance. He would do so for an ostensible purchase price that would enable the purchaser to obtain a new mortgage in an amount which covered (a) the redemption from the pending foreclosure sale, (b) a material profit for himself and/or other amounts to be received by the purchaser (if Defendant was not the purchaser), plus (c) possibly a relatively small amount of money for the Seller (the Plaintiff in this case). As part and parcel of the arrangement, the purchaser would also enter into an agreement under which post-closing Plaintiff (Seller) would lease the property from the purchaser and continue to occupy it after the closings on

2

the new mortgage and the sale, by paying rent (in an amount about equal to the mortgage payments under the new mortgage obtained by the purchaser) for a specific period, at the end of which, Plaintiff was supposed to be able to recover the Property under certain terms and conditions - failing the satisfaction of which the Purchaser would thereafter own the home free and clear of any rights of Plaintiff.

At the time of these transactions, Plaintiff was then a 57 year old woman whose formal schooling ended in the 11th grade. Her monthly available income was some $800.00 per month derived from social security disability benefits (some $694.00) and a bridge card. In this case, what specifically happened was that Defendant, having some credit problems of his own, enlisted the involvement of what even he describes as a "straw man," a Dion Fenderson, to act as the purchaser of the Property on behalf and in the stead of Defendant. Defendant then prepared a written Purchase Agreement providing for the sale of the Property by Plaintiff to Dion Fenderson for $85,000.00, subject to (a) Fenderson obtaining a mortgage for $85,000.00, and (b) the payment by Fenderson to Plaintiff of a $1,000.00 deposit. Defendant then admittedly (a) forged the signature of Plaintiff on that Purchase Agreement, and (b) forged two $500.00 money orders to evidence the indicated deposit (Plaintiff was neither given, nor saw, the Purchase Agreement or the stated deposit prior to the closing). The Purchase Agreement required Plaintiff to give possession at closing to the Purchaser. It made no mention of any post closing lease by Plaintiff of the Property or any option to buy, or any sums to be paid the Purchaser or Defendant at closing other than what might be inferred as what was left after redemption of Plaintiff's mortgage and closing costs. On its face, at least, the Purchase Agreement appeared to provide that Plaintiff would get the net proceeds remaining after paying off the foreclosure sale redemption amounts, proper closing costs, and

3

adjustments. Defendant and Fenderson, then pursued the matter of obtaining the new mortgage necessary to finance the purchase, utilizing, among other things, the forged Purchase Agreement and deposit acknowledgments. Apparently Defendant or someone was able to arrange for an appraisal of the Property with the result that a new mortgage in the principal amount of $80,700.00 was committed to. On or about September 21, 2005, the sale and new mortgage transactions were consummated at the offices of an officiating title insurance company. Plaintiff was present, and at the direction of Defendant, she signed various closing documents, including a Deed to Fenderson and a Settlement Statement relating to the new mortgage. The Settlement Statement detailed closing facts and disbursements, showing, among other things, (a) a Property sales price of $85,000.00, and (b) as reductions of amounts due Seller, (I) a redemption of the foreclosed mortgage for $56,610.23, (ii) a deposit of $1,000.00 received by the Seller, (iii) "Seller Concessions" of $5,100.00, and (iv) a payoff of what is described therein as a "second mortgage" in the amount of $18,425.68 to "Fort Knox Improvements" (which was one of Defendant's assumed names). In fact, there was no "second mortgage" as such. Rather, Defendant had prepared and presented at closing a predated, fictitious "Invoice" on "Fort Knox Improvements" letterhead identifying Plaintiff as the "customer," identifying the address of the Property, and stating the following:

| | |
|---|---|
| Install copper pipe entire house | $5,425.68 |
| Upgrade electrical system to 100 amp | $3,669.00 |
| Remodel bathroom (cabinets, tub, sink, etc.) | $4,108.00 |
| Prime and paint entire house | $ 223.00 |
| TOTAL DUE | $13,425.68 |

This false invoice was created solely for the purpose of enabling the closing and as a way of diverting some, if not almost all, of the net proceeds of the new mortgage directly to Defendant (and

4

not to Plaintiff, or then at least, to Fenderson). As presented, it certainly represented to the mortgagee, that such work had already been done and Fort Knox Improvements was owed that amount for what was thereby represented as completed work. It was in effect also a representation to other parties involved to the same effect. As relates to that, as a matter of clear fact, the Court finds (a) that none of the work referred to in that invoice had been done by Defendant prior to the closing, (b) Defendant never intended to do it, and (c) the Purchase Agreement did not obligate either Fenderson, Defendant, or anyone else to ever do any of that work. Out of that $13,425.68, which was paid to him at the closing, Defendant paid Fenderson close to $4,000.00 as his "straw man" fee, and in addition, apparently also later paid Fenderson some $7,500.00 or so. At the closing, Plaintiff received only $500.00, and nothing thereafter. It appears that Fenderson also likely made false representations to enable the closing, such as the specific covenant in his new mortgage that he would be occupying the Property as his residence within 60 days after the execution of the mortgage and would continue to occupy it as his residence for at least one year after such occupancy. That was never intended nor true and Defendant and Fenderson knew it. What is also relevant is a "Residential Lease With Option to Purchase" ("Lease"). That was a document also drafted by Defendant. It is dated the day after the closing (but likely actually prepared before and executed immediately after the closing had taken place, but on the day of the closing). It was signed by Fenderson and also by Plaintiff at the instance and urging of Defendant in pursuance of the entire arrangement. Under it, Plaintiff agreed to lease the Property for one year starting October 1, 2005, paying rent to Fenderson of $620.00 per month (approximately the then thought to be monthly payment under Fenderson's mortgage). It also provided Plaintiff with an option to purchase the Property for $80,700.00, exercisable during the one year lease period. The said purchase price was

to be paid by way of application of a stated paid $1,000.00, plus application thereto of the $620.00 per month rent, with the entire purchase price balance due by the 13th month after the October 1, 2005, lease commencement date; i.e., essentially at the termination of the one year lease. Post closing, Plaintiff continued to occupy the Property, and did not directly pay rent for the initial six months (apparently pursuant to some sort of agreement possibly utilizing some of the sale proceeds for that purpose). Thereafter, Plaintiff (assisted by her daughter) starting paying $590.00 monthly as rent in cash directly to Fenderson (the change from $620.00 resulting from some downward adjustment in his mortgage payment). She stopped paying that rent when she became suspicious and concerned about not getting the Property back and receiving no responses to her inquiries to Fenderson or Defendant. The monthly mortgage statements were being sent to Fenderson addressed to him at the Property (consistent with his false representation he was going to be living there) and at some point the notices indicated the mortgage was in default. Realty tax payment default notices were sent there as well. Fenderson himself at some point stopped paying his mortgage on the Property and that mortgage was eventually foreclosed, resulting in Plaintiff eventually vacating the Property in 2008. Plaintiff sued Fenderson in state court and obtained a judgment against him, payment of some $9,000.00 of which was apparently obtained by way of garnishments. Fenderson then filed his own bankruptcy case and, in that case, Plaintiff apparently obtained an additional $2,500.00 pursuant to a settlement of an adversary proceeding therein brought by Plaintiff, essentially mirroring the Complaint in this proceeding in this bankruptcy case.

      The Court also factually finds Plaintiff was insufficiently educated and unknowledgeable to the point of not being able to fully understand and appreciate the meaning and ramifications of the various transactions detailed, with the result that she essentially relied entirely on Defendant's

6

10-06356-wsd    Doc 45    Filed 06/03/11    Entered 06/03/11 10:15:53    Page 6 of 12

statements and representations as to the meaning and purport of those transactions and what the written documents said or contemplated.

In sum, the important findings of fact, herein made and detailed, which are as noted based on the documentary and testimonial evidence and what the Court concludes as to the latter was Plaintiff's more credible testimony, but other credible testimony and evidence as well, are such that, at the point in time when Plaintiff signed the deed to her Property and it was delivered to Fenderson incident to the closing of the sale to him (and that is the crucial point in time), she was relying on the following: (a) the written statement in the initial letter to her from Defendant, which among other things said that "we can find a way for you to stay and still save your house, and make money at the same time;" (b) Defendant's repeated oral statements to Plaintiff that (I) following the closing she would be able to live in the Property rent free for six months; (ii) thereafter she would have to pay rent for six months; (iii) if she paid the indicated rent for that six month period without missing a payment, the Property would be turned back to her (note that she had in fact asked Defendant if she would have to pay any additional monies to get the Property back and she said that he answered "no"); (c) the referred to forged Purchase Agreement which was the basis for the entire transaction, had not been shown to her (but in any event it did not contain any provisions regarding what was to happen post closing other than that she was to turn over the Property at closing); (d) the referred to Residential Lease with Option to Purchase had not been presented to or signed by Plaintiff (though it was shortly after the closing) and she had not been told orally, nor was she then aware of its provisions, which stated that for her to be able to get the Property back she would have to obtain a new mortgage in a sufficient amount to pay off Fenderson's new mortgage, and be able to do so based on her own financial situation and resources immediately after the end of the six month period

7

during which she was to be paying rent; (e) Defendant and Fenderson were aware of the facts that Plaintiff had lost the Property thru foreclosure because of her financial inability to make the mortgage payments and that she was unable to work because of a continuing disability and her total monthly income at the time, which most likely would continue for much more than a year, consisted of $693.00 in social security benefits and $1.00 from the State of Michigan, or a total of $694.00; and that for her to be able to even make the post closing rent payments of close to $600.00 per month (some 87% of her income) would require some financial help (as had previously been the case) from her daughter on an ongoing basis; and (f) thus, it was totally unlikely and illusory, if not impossible (and grossly reckless to even consider) that Plaintiff could ever, let alone within the required year, be able to apply and qualify for and actually obtain whatever refinancing might be necessary to re-obtain the Property and in the process pay the purchase price indicated in that agreement and to pay-off the Fenderson mortgage.

## II. ANALYSIS

The Complaint seeks a finding of non-dischargeability under 11 U.S.C. § 523(a)(2)(A). What is required of Plaintiff is that, by a preponderance of the evidence, she shows a debt arising from the obtaining of money, property, services, or an extension or renewal, or refinancing of credit, by false pretenses, a false representation, or actual fraud (1) that at the time the Debtor knew was false or made with gross recklessness as to its truth, (2) the Debtor intended to deceive the Plaintiff, (3) the Plaintiff justifiably relied on the false pretense, representation or actual fraud, and (4) such was the proximate cause of the loss. See *In re Rembert*, 141 F.3d 277 (6th Cir. 1998). It must be initially noted that the scope of actual "fraud" encompassed by this statute goes beyond misrepresentations or misleading omissions (though both of such do exist in this case) and includes

8

"all surprise, trick, cunning, dissembling, and any other unfair way in which another is cheated." *McClellan vs. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quoting from another case).

Given the forgoing factual findings, it's hard to avoid the legal conclusions that:

(1) Defendant (as well as Fenderson) obtained Plaintiff's interest in the Property and, incident thereto, money; and,

(2) They did so by way of (a) primarily an affirmative misrepresentation that if she paid rent for six months, she would get the Property back (without additional payment), and/or (b) by a "silent misrepresentation" being suppression of the facts that in order to recover the Property she would have to apply and qualify for and obtain a new mortgage, when the facts were that it would be virtually impossible for her to do so. The circumstances being such that Defendant was under a duty to make such disclosures arising, if from nothing else, as a result of her question as to whether she would pay (and by necessary inference) do anything to get the Property back.

(3) The noted other misrepresentations (made directly to the Fenderson's new mortgagee and the title company involved in the closing, even though such were third parties) were essentially designed to influence the conduct of Plaintiff and her participation in the consummation of the sale and pay-off of her mortgage; or, put differently, Defendant's misrepresentations by way of at least the forged Purchase Agreement were intended to produce the results of not only a new mortgage for Fenderson, but a surrender of the ownership of the Property by Plaintiff.[1] (See *Restatement of Law Torts*, (second) § 531 for the reach of representations to third parties;

---

[1] The false representation about the repairs made to the Property by Defendant while clearly made to the new mortgagees, can also be considered to have been made to the Plaintiff as well, i.e., that money had been, or would be used for that purpose thus enhancing the value of what she was told would be returned to her.

9

(4) Defendant intended to deceive the Plaintiff;

(5) Plaintiff reasonably and justifiably relied on the misrepresentations;

(6) The misrepresentations were clearly the proximate cause of the loss of Plaintiff of her interest in the Property.

Finally, and apart from the foregoing specifics, it can fairly be concluded from all of the facts and circumstances that Plaintiff in essence was the victim of the kind of surprise, cunning, dissembling, and unfair practices that come within the scope of what Courts say constitutes actual fraud for purposes of U.S.C. § 523(a)(2)(A).

Defendant argues in defense, among other things (1) that considering what he paid out to Fenderson, he himself did not make any money on this particular deal and in fact lost money; (2) that the false invoice relating to the repairs is a "red herring" because that was "how these deals were structured back in the day;" and, (3) that "all the title companies, mortgage brokers, and lenders involved with these transactions back in the day would turn a blind's eye to this structuring." One wouldn't be surprised if some did. However, Courts, when presented with such facts, do not and should not lend themselves to outcomes which can even remotely be seen as approving, aiding, or giving their imprimatur to the perpetuation of what occurred in this case, or transactions based thereon. Defendant apparently either would like to portray, or saw himself as some sort of foreclosure Robin Hood, robbing the richer mortgage companies and their ilk to pay the poorer, to say nothing of himself and/or his business partners. He seems to think he was doing Plaintiff a favor in this case by getting her $500.00 and deferring her loss of possession, albeit at a rental cost. For all we know given the oncoming mortgage foreclosure situation, she might have been able to stay in possession for the same length of time without paying anything, given the increasing reticence

10

of foreclosing mortgagees to actually take back foreclosed upon properties from defaulting mortgagors. Irrespective and regardless of that, however, what happened in this case is that, seeking to take undue advantage of a woman in unfortunate circumstances, Defendant's legal and moral compass went askew and in the process he ran afoul of U.S.C. § 523(a)(2)(A) of the Bankruptcy Code. As a result, the facts and applicable law require he pay the statutory price of non-dischargeability.

The Court also concludes, given the foregoing, that it is unnecessary to deal specifically with fraud claims violations by way of the Michigan Consumer Protection or Home Solicitation Sales Acts, or claims of conversion.

That said, the amount of the liability or debt should be determined and it is appropriate that this Court do so at the very least, to avoid further and unduly expensive litigation and re-litigation in a state court.

The measure of damages involved in fraudulent misrepresentation is set forth in Restatement of Torts (second) § 549:

> § 549. Measure of Damages for Fraudulent Misrepresentation
>
> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
>> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>>
>> (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
>
> (2) The recipient of a fraudulent misrepresentation in a

> business transaction is also entitled to recover additional
> damages sufficient to give him the benefit of his contract
> with the maker, if these damages are proved with reasonable
> certainty.

The trial of this proceeding did not sufficiently focus on the damages aspect of the matter and the record as it now stands, is insufficient to permit a reasoned finding the amount of such and any credits which might be applicable. Accordingly, a status conference is set for July 5, 2011, at 1:30 p.m., for the purpose of developing an expedited procedure to determine the amount of the undischargeable debt.

**Signed on June 03, 2011**

                                            **/s/ Walter Shapero**
                                        **Walter Shapero**
                                        **United States Bankruptcy Judge**